Good morning, everyone. The first case on our call this morning is agenda number one, case number 100983, People of the State of Illinois v. Joseph Bannister. Mr. Baps, are you ready to proceed? All right, you may proceed. May it please the court and counsel, good morning, your honors. I represent Joseph Bannister. Mr. Bannister was convicted of the murder of Henrietta Banks, of the attempt murder of Sharon Banks and a home invasion, and he was sentenced to death. The first issue that I'll argue is the second issue in my brief involving the instruction that we believe should have been given in this case. In capital cases, a sentencing jury will view a defendant who is eligible for parole as a greater threat to society than a defendant who will never be released, and they will be more willing to impose a sentence of death. This principle was recognized by the United States Supreme Court in Simmons v. South Carolina in 1994, but six years previous to that, this court's decision in Gatcho foreshadowed the Supreme Court's recognition. In Gatcho, this court recognized that from the way in which our jury instructions were written, a jury could have believed that the defendant in a multiple murder situation would possibly have gotten out, and in order to protect society, they would need to sentence the defendant to death. This court held that where the only sentence other than death was natural life imprisonment, further instruction was required telling the jury of this fact. Now, natural life imprisonment means that a defendant will never get out, that he will spend the rest of his life in prison. Joseph Bannister's case is unique and has not been considered by this court in any of the previous decisions of this court. Mr. Babbitt, is there any significance to the fact that the defendant here could have received the statutory terms of years? Those are significant differences from the law previous to that. It's much more similar to a situation where, in a multiple murder situation, where you have a mandatory natural life sentence if death is not imposed. In Mr. Bannister's case, you have a mandatory minimum sentence that amounts to a natural life imprisonment. These laws, the mandatory add-ons and the mandatory consecutive sentences, meant that Joseph Bannister would have received a minimum sentence of 107 years if he did not receive the death sentence. Now, the relief that we're asking in this case is the same as the relief that this court granted in Gaccio. The defendant in this case would never get out. He was not going to be a threat to society. Gaccio recognized that the jury could be misled by our instructions and held that, in that situation where a defendant would never be released from prison, if as the only alternative to the death sentence, that in those circumstances, an instruction was required to have a death sentence. It was necessary to accurately tell the jury what it needed to know to make a decision as to whether or not the death penalty was appropriate. Is that the precise rule you're advocating here? In other words, are you limiting it to only in those circumstances where you get a sentence that amounts, a minimum would be a sentence that would amount to natural life? That is the only request that I'm asking for obvious reasons. One, the minimum sentence is probably not the sentence that Mr. Bannister would receive if he didn't get the death penalty. The minimum was 107 years, which added to his age would have meant that he would be at a minimum 133 years old before he would be eligible to be released if he got all his good time. But you're not espousing a rule that would say in every death penalty case the jury ought to be instructed on what the minimum sentence would be for the defendant would be if it were something less than natural, effective natural life, let's put it that way. No, Justice Garmon. I'm not advocating that rule, but in this case where it's not contested that the defendant will spend the rest of his life in prison based on the minimum sentence that he is mandatorily required to get absent a death sentence, that in those circumstances at a minimum you need to tell the jury he will never get out of jail if you don't give him the death penalty. He will get 107 years in prison. That doesn't specifically tell them that he's never going to get out of jail, but it pretty well tells them that he's never going to get out of jail. Was that instruction offered? No, Your Honor, it was not. The instruction that the defense attorney in this case asked for was that the jury be allowed to know that the defendant could receive a sentence of natural life imprisonment. That was rejected by the trial court based on previous decisions of this court. However, what the trial attorney in this case should have done and should have recognized is that the minimum sentence the defendant was going to receive absent the death sentence was natural life. It wasn't natural life in those words. It was natural life because he was going to have to serve 107 years or with good time credit I think it was 97 years that he would have to serve. Under those circumstances the defense attorney should have recognized that and asked for the instruction that we're advocating. It's essentially what this court said in Gacho should be done and had the attorney realized the minimum sentence in this case that would have been the appropriate instruction to ask for. Doesn't that become, in this case, maybe it's a little easier to employ, but if that's the bright line rule with respect to where it's a distinction without a difference number of years versus natural life, do we have to look at cases, for example, if the defendant had a heart condition and had a life expectancy of 12 years and his sentence could be 20 years, is that tantamount to natural life? Wouldn't that be a problematic assessment to make? Certainly, Justice Thomas, that will be problematic in a future case, not in this one, obviously, as you recognize. The only thing that I'm advocating is in this case that there's clearly no controversy. The state has not argued that the defendant is going to get out of jail when he's 133 years old for obvious reasons. And so in this case, we don't have any problem. In any future cases, the only thing that I would suggest would be that this would be something that a trial court would be in a better position to determine, that the arguments could be made to a trial court in a future case if someone had a heart condition or if a very elderly person were to commit a crime, then you would leave that up to the trial court's discretion. That's the only other way that I can see the best possible way in a future case. That's not before this Court. We don't really have any question, there's no controversy that the defendant in this case is not going to get out of jail. He's either going to get the death penalty or he's going to spend the rest of his life in jail. In addition to the instruction that we believe should have been given based on GACCHO, we've also argued that there was an instruction that was given that was inappropriate, was confusing, and misstated the law. That's the third issue in my brief. The modified IPI 7C6 that was prepared by the prosecutor, it was given over objection, the instruction that should have been given was prepared by defense counsel. And it reads, if after weighing the factors in aggravation and mitigation, one or more of you determine that death is not the appropriate sentence, then you should sign the verdict requiring the court to impose a sentence other than death. This language matches the actual statute. It's very easy to understand. It states that one and only one juror needs to decide that death is not the appropriate sentence. And if that happens, then a no death verdict should be signed. This instruction was refused by the trial court. And the modified instruction that was prepared by the prosecutor contained confusing language. There was a double negative in it. And if it's read literally, it tells the jury that they must unanimously find, that they have to unanimously find that death is not the appropriate sentence. And that's just inaccurate. The instruction reads, if you do not unanimously find from your consideration of all the evidence and after weighing the factors in aggravation and mitigation that death is not the appropriate sentence, then you should sign the verdict requiring the court to impose a sentence other than death. Now, besides not making any sense, it does say that they have to unanimously find that death is not the appropriate sentence. And that's incorrect. Other instructions were given that correctly gave them the standard. But that does not mean that the error in this case is harmless or corrected. If even one instruction could have confused the jurors, then reversal is required. There could have been one juror who was holding out for no death. And by directing his attention to the language in this confusing instruction, that juror could have been convinced that his vote meant nothing.  If you do not unanimously find that death is not the appropriate sentence, that could have led a juror to have changed his vote. And based on that, it's our position that this instruction, prepared by the prosecutor and given over objection by defense counsel, was so confusing that the validity of the verdict in this case is called into doubt and requires reversal. Unless the court has any other questions. If we agree that that instruction is confusing, of course, it does ultimately say that the jury should enter a verdict other than death. How do you respond to the, it appears that the defense-tendered instruction was incorrect also because it refers to a sentence of up to natural life. Is that correct? That's correct, Your Honor. And I agree that that should not have been included in that instruction. The defense attorney, again, was trying what I think was a good effort to get an opportunity to tell this jury, you don't have to worry about the defendant being released. He's going to be in jail forever. He didn't do it appropriately. If that instruction had included language that this court has approved in People v. Gaccio, then it would have been a correct instruction. But at a minimum, the last phrase in that instruction was incorrect and could have been excised. It was much more easily understood than the prosecutor's instruction. It's your position that this court has never rejected the kind of instruction that you're seeking here? The instruction with respect to, this court has held in Bean and Williams, and I believe there was another case cited, that in situations where defendants are subject to the minimum and where defense attorneys have asked for instructions saying that the defendant is subject to a range of penalties, that in those circumstances, that instruction is not called for. The defendants in Bean and Williams and the other case that I can't recall the name of were subject to a minimum sentence of 20 years. There could easily have been a controversy regarding whether that defendant, after serving a minimum sentence with good time credit, if any, that whether that defendant could be released into society and then provide a threat. So in those cases, there could have been, and probably would have been, a question of whether or not the defendant would spend the rest of his life in prison. That certainly wasn't addressed in those cases. There was no, the court did not address whether those defendants would spend the rest of their life in prison regardless of the minimum sentence. So what we have is a case that has come up since the mandatory add-ons and since the mandatory consecutive sentences, I believe in 2000, those came into effect. The defendant in this case was charged with this crime in August of 2000. So it was the very first year that the mandatory consecutives were in the statute. So we have a situation where those prior cases of this court dealt with defendants who were not subject to mandatory add-ons for using a firearm and causing great bodily harm. And that makes the difference, the mandatory add-ons. That makes a difference in my suggestion to you that those prior decisions do not prohibit you from giving that instruction in this case. Those prior decisions were prior to these mandatory sentences which result in this huge minimum sentence for Joseph Bannister. Those cases dealt with situations where defendants could have received a minimum sentence of 20 years. Clearly, Joseph Bannister, under the new laws, could not have received a minimum sentence of 20 years. So in that respect, those prior decisions are inapplicable to Mr. Bannister. Mr. Bannister is much similar in nature of a defendant to Robert Gottschalk. He was subject to a mandatory minimum sentence of natural life imprisonment or death. The defendant in this case is subject to a mandatory minimum sentence of 107 years or death. I suggest to this court that there's no difference between a mandatory minimum of 107 years and mandatory natural life imprisonment. You're standing on your brief, evidently, of the defendant's position that he did not make a knowing and intelligent waiver of his rights to have a jury determine his guilt. Yes, I am, Your Honor. Does he make any argument regarding what he would have done differently had he been properly advised? With respect to? The waiver of the. Of his right to a jury trial for guilt or innocence? Yes. No, there was no argument what he would have done otherwise. He didn't indicate that he would have chosen to have a jury determine his guilt. He doesn't even make that. That was not, there was no argument made that he would have chosen a jury had he been properly admonished regarding his rights. Thank you, Your Honor. Thank you, Mr. Bibbs. Ms. Gaines. Good morning, Your Honors. May it please the court, counsel. My name is Carol Gaines, and I represent the people of the state of Illinois. On September 23rd of the year 2000, six-year-old Brittany Bannister had to ask her father, the defendant Joseph Bannister, Daddy, are you going to kill all of us? Daddy, are you going to kill everyone in this room? After the defendant stood there with a gun pointed at her grandmother while her grandmother held Brittany in her arms. This was after Brittany observed her father, the defendant, kick the door into her home, shoot her mother twice, shoot her aunt three times, killing her all in front of the six children who lived in her home. With that in mind, I'd like to address the issues raised by the defense counsel this morning in court. With respect to the gotcho instruction, this court has held that gotcho is only applicable to a multiple murder situation. It has never been extended to a situation where there is a single murder indictment. And the reason for that, this court has held, that as long as there is another sentencing option, a term of years or even natural life, as long as there's an alternative, there is no reason to instruct the jury with the mandatory natural life provision. Such an instruction the defendant has posited here today is contrary to this court's well-established precedent, which does not recognize and should not recognize a de facto, which he calls in his brief, a de facto natural life sentence, which it's based on a term of years. I would point out, as Justice Thomas pointed out, that where do you draw the line? Where do you stop having to take into account, if you allow it in this case, where do you allow it down the road, and why do you put that in the hands of the trial court? What about a defendant? You have to take into account the defendant's health history, his condition in life, the term of years, if you have an older defendant with a smaller term of years or a greater term of years, with a younger defendant with a health history. Who knows? All those factors, if the jury has to consider those and be told those and be explained that to them, detracts the jury from their job of assessing whether death is an appropriate sentence based on the factors in aggravation and mitigation. This court has, again, repeatedly not allowed in a single murder prosecution, has repeatedly refused to extend GACCHO, and we would argue, once again, it's not recognized and this court should not further extend that rule. With respect to the jury instruction issue, the verdict forms in this case, the closing arguments and the jury instructions sufficiently conveyed unanimity requirement to the jury. At both stages of opening and closing argument at the aggravation mitigation stage, the defense counsel repeatedly informed the jury regarding the unanimity requirement. Before they got one instruction from the trial judge on four separate occasions, the defense attorney, it's all she argued. If one of you, if one of you, if any one of you, if any one of you finds that death is not an appropriate sentence, then you sign a non-death verdict. The jury was then informed correctly on several instructions. Under IPI 7C.05, under the law, the defendant shall be sentenced to death if you determine unanimously after weighing the factors in aggravation and mitigation that death is the appropriate sentence. If after weighing the factors in aggravation and mitigation you are unable to determine unanimously that death is the appropriate sentence, the court will impose a sentence other than death. They were given verdict forms which told them what to do if they were unanimous, told them what to do if one or more of them had determined that death was not the appropriate sentence. The glitch in the instructions comes in 7C.06, the second paragraph, which in fact includes the insertion of the word not in the final sentence. The flaw in that instruction, contrary to what the defense has argued, is that it doesn't really tell the jury what to do if they're unanimous for no death. And under those circumstances, no rational group of 12 people who have all decided that they're not in favor of the death penalty are going to sign a death verdict. Basically, when the jury went back to deliberate, they had three options. They could be unanimous for death. Under those circumstances, you look at the verdict form and you sign a death verdict. If you are not unanimous, whether you're 1-11, 11-1, 6-6, 10-2, whatever it is, if you are not unanimous for the death penalty, or if you are not unanimous for no death, then you sign a no death verdict. The jury instruction, the problem with the instruction, is that it doesn't tell the jury what to do if they're unanimous for no death. It doesn't tell them you have to be unanimous for no death. Under the circumstances, while we're unanimous for no death, then we sign a no death verdict. If you have to look at the instructions as a whole, you cannot look at one word in one instruction in isolation. The question is whether or not the jury instructions as a whole fully, fairly, and accurately and comprehensively apprise the jury of the relevant legal principles. In this case, it is the people's position that, in fact, the instructions did just that. And when considered together with the closing arguments, especially the verdict forms, the death findings should be affirmed. To ask a question about the closing arguments. During the course of the trial, the prosecutor asked the defendant's sister whether the defendant had expressed remorse for his crime. That's correct. The defense counsel objected, and the question was sustained, the objection was sustained. Nevertheless, the prosecutor asked again whether he had shown her any remorse, and then again the objection was sustained. But during closing argument, the prosecutor asked the jury whether they had heard sorrow or remorse from the defendants. Both statements were objected to, and the jury was told to disregard. But it just puzzled me. What was the purpose in defying the trial judge's ruling by the state and arguing about the lack of testimony regarding remorse? Well, the test, I'm sorry. What was the purpose in defying the judge's ruling all during the trial regarding expression of remorse or the lack of expression of remorse? I don't think, Your Honors, at all it was an act of defiance by the prosecutor. By no means was there any sort of lack of remorse theme here at all. Were those rulings that I have just outlined accurate during the course of the trial regarding the sister? No, I think no, they weren't accurate. In regards to the questioning of the defendant's sister during mitigation, I think those rulings weren't accurate. The prosecutor was questioning the defendant. I mean by recitation of what had happened at the trial. Yes, the recitation is accurate. I would argue that the sustaining of the objections to the questions to the defendant's sister during mitigation cured any problem with that regarding the propriety of that. With respect to the closing argument, the prosecutor's comments regarding the defendant's lack of remorse were really based on the defendant's statement to the police as well as the defendant's infractions while he was in prison and the things he took responsibility for and didn't take responsibility for. It was an attack on evidence that was in fact in trial with respect to the defendant's statement to the police and his criminal background. The objections to those comments by the prosecutor in closing argument, it did not carry that there was a theme of remorse or that the defendant hadn't taken the stand and shown his remorse. The questions were objected to. The objections were sustained. The jury was instructed to disregard if you find any impropriety in that. Any impropriety was cured by the trial judge's actions in doing that. And they certainly didn't impact the death verdict in this case with respect to that very minimal argument given by the prosecutor. For these reasons, Your Honors, as well as the other reasons stated in the counsel's brief, people would ask this court to affirm the defendant's convictions, the imposition of the death sentence, and set a date certain for his execution. Thank you, Ms. Gaines. Rebuttal, Mr. Best? To answer Justice Freeman's question with respect to why the prosecutor would continue to ask questions regarding the defendant's lack of remorse, I can't read the mind of the prosecutor, but I can't think of any reason other than defying the trial court by repeatedly asking and including that in his closing argument he was simply trying to sway the jury, that this defendant was not worth allowing to live, and it was inappropriate and should not have been done. With respect to the question, the modified IPI that we ---- And the remedy for its inappropriateness? I'm sorry, Your Honor? The remedy for its inappropriateness? Well, our remedy that we've asked for is that the defendant receive a new sentence in hearing. With respect to the modified IPI instruction, the State has suggested that all the other instances where the jury received the correct standard, that they must be unanimous in finding that death is the appropriate sentence. We don't know what instructions the jury is focused on. The State can't read the jury's mind any more than I can. We don't know what they said back there, what they discussed, which instructions they looked at, who held up the bad instruction and said, hey, look at this, we have to be unanimous in finding that death is not the appropriate sentence. We don't know what happened. When there are conflicting instructions, one with good law, one with bad law, this Court has held the error is not harmless and reversal is required. With respect to the first issue, the GACCHO instruction, the State continues to emphasize the fact that this is a single murder versus a multiple murder. And I find it somewhat ironic that Mr. Bannister would have received the benefit of the GACCHO instruction had Sharon Banks unfortunately died as a result of the gunshot wound she suffered. This is a situation where the defendant doesn't receive the benefit of the instruction because one of his victims lived. It's very ironic. This Court should recognize that the circumstances of Joseph Bannister are the same as the circumstances of Robert GACCHO. Instructions should be given in this case. What we're talking about when we talk about how we're going to decide this down the road, as the State has suggested, that it's going to be too hard to figure out when to give the instruction, when not to give the instruction. Right now we're faced with whether or not the death penalty that was imposed on Joseph is a reliable sentence. And we don't know that because the jury could have decided that he might get out of jail and we don't want that so we're going to give him the death penalty. Well, he's not getting out of jail and he should have gotten an instruction that told him that. We want to know that the death sentence that Joseph got was reliable, not the one that comes up next year or five years or ten years down the road. For these reasons, we suggest that the defendant's sentence should be vacated and the cause remanded for a new sentencing hearing. Thank you, Your Honors. Thank you, Mr. Babs. Thank you, Ms. Gaines. Case number 100983, People of the State of Illinois v. Joseph Bannister, is taken under advisement as agenda number one.